**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division


MONA LISA LINKOUS,

        Plaintiff,

v.                                     ACTION NO. 4:10cv16

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,

        Defendant.


## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") that denied Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. This Court recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

On September 17, 2007, Plaintiff Mona Lisa Linkous filed an application for a period of

disability and DIB (R. 96-103),[1] alleging that she had been disabled since September 1, 2002, due to post traumatic stress disorder, torn rotator cuff and dislocation of the right shoulder and arm. (R. 134.) The Commissioner denied Plaintiff's application initially (R. 64), and upon reconsideration. (R. 65.) Plaintiff received an administrative hearing on June 4, 2009 (R. 38-63), and the Administrative Law Judge ("ALJ") issued a written decision denying Plaintiff's claim on July 1, 2009 (R. 9-22).

On December 15, 2009, the Appeals Council denied Plaintiff's request for review (R. 1-4), which rendered the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed the instant action for judicial review pursuant to 42 U.S.C. § 405(g). This case is now before the Court for disposition of the parties' cross-motions for summary judgment (ECF Nos. 10 and 14).

## II. FACTUAL BACKGROUND

Plaintiff is currently 54 years old. (R. 96.) She completed high school, attended community college, and graduated from Bible college. (R. 43.) She has approximately 13 to 15 years of past work experience as a cosmetic manager in a department store, a banquet manager, a hostess, a waitress, and a restaurant manager. (R. 45-46.) On January 21, 2002, Plaintiff was attacked, robbed and beaten by four men in the Hecht's employee parking lot at Chesapeake Square Mall. (R. 97.) Plaintiff suffers from post-traumatic stress disorder and pain in her right shoulder. (R. 47-49.) According to the earning records, Plaintiff acquired quarters of coverage to remain insured through December 30, 2007. (R. 46.)

### A. Medical Evidence in the Record

On May 17, 2002, prior to her alleged onset date, Plaintiff asked her family physician, Dr.

---

[1] Page citations are to the administrative record (ECF No. 7).

Younger, for a referral to counseling due to stress. (R. 367.)

On June 6, 2002, Plaintiff presented to Riverside Mercury West Medical Center complaining of a right shoulder injury that occurred in January 2002 when she was robbed and assaulted at her work place. (R. 187-88.) Plaintiff also described experiencing mental stress as a result of this incident and requested counseling. (R. 187.) Eric Fee, M.D., examined Plaintiff and noted no abnormalities except for "discomfort" in the right shoulder. Id. Dr. Fee assessed a shoulder/arm sprain/strain and an "adjustment reaction with emotional disturbance." Id. He prescribed Celebrex for pain and referred Plaintiff for an evaluation for physical therapy, orthopedic surgery consult, and evaluation for mental health therapy. Id.

Between July 15, 2002, and January 20, 2003, Plaintiff attended monthly individual therapy sessions at Hampton Mental Health Associates. (R. 216-27.) At her initial therapy session, Plaintiff disclosed that she quit her job due to anxiety, panic attacks, and flashbacks related to the robbery and assault. (R. 226.) In July 2002, Elizabeth Williams, Ed.S., assigned Plaintiff a GAF of 55/75 and noted her level of functioning was "severely impaired." [2] Id. The goal of Plaintiff's therapy was to alleviate the symptoms of her PTSD by reducing her anxiety and integrating the robbery and assault into her life experience. (R. 227.) Williams assessed Plaintiff's level of functioning as moderately or mildly impaired during the August 2002 through January 2003 sessions. (R. 216-25.) Plaintiff's alleged onset date is September 1, 2002. (R. 134.)

On March 10, 2003, Plaintiff reported "mild panic in crowds" and feeling good about her progress with PTSD symptoms. (R. 215.) Ms. Williams assessed a "good" level of functioning.

---

[2] A global assessment of functioning (GAF) in the 51 to 60 range is indicative of some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

Id. During an "emergency" therapy session on July 7, 2003, Plaintiff disclosed that she was getting married that Saturday, and was feeling increased anxiety. (R. 214.) Plaintiff did not return for any therapy sessions for the remainder of 2003 or in 2004.

Loel Z. Payne, M.D., treated Plaintiff beginning in July 2002 for shoulder pain. (R. 403-07.) On September 27, 2002, Dr. Payne performed arthroscopic shoulder repair. (R. 408-410.) Two and a half months later, Dr. Payne indicated that Plaintiff could continue with light duty work restrictions. (R. 317.) On June 3, 2003, Dr. Payne completed a Physical Capacities form which indicated Plaintiff had no restrictions on sitting, standing, and walking; could lift and carry twenty pounds frequently and thirty pounds occasionally; could not push or pull with her right upper extremity; and, could not reach or climb. (R. 307.) On June 3, 2003, Dr. Payne again stated that Plaintiff could perform light duty work with restrictions against overhead work and heavy lifting. (R. 273.)

Between July 3, 2003, and January 8, 2004, Plaintiff visited Cynthia C. Su, M.D., a physiatrist, five times for treatment of her shoulder. (R. 190-201.) Dr. Su provided Plaintiff with trigger point injections, medication, a referral for physical therapy, and home exercises. Id. As of January 8, 2004, Dr. Su formed the impression that Plaintiff had (1) chronic myofascial pain of the neck, back, and shoulders; (2) mild shoulder instability, which was improving; (3) anxiety and PTSD; and, (4) symptom magnification secondary to (3). (R. 190, 271.)

Plaintiff attended physical therapy at various times on referrals from Dr. Payne and Dr. Su. (R. 237-45, 261-64, 266, 275-80, 283-85, 288-94, 305-06, 308-09, 311-16, 439-509.) On December 28, 2003, Wayne A. MacMasters, M.S., P.T., opined in a functional capacity evaluation that Plaintiff could work at the sedentary and light physical demand classification with maximum

lifting of twenty pounds. (R. 302-04, 436-38.) Mr. MacMasters also indicated these results did not accurately reflect Plaintiff's true functional capacity, as Plaintiff exhibited submaximal effort during testing. Id.

On January 19, 2004, Dr. Su wrote a letter to Plaintiff's former employer indicating she reviewed Plaintiff's work capacity evaluation and agreed that Plaintiff could perform work at the light physical demand level, including her former job as a cosmetic representative. (R. 189.) Dr. Su noted that Plaintiff could not lift more than twenty pounds, especially side to side. Id.

On January 20, 2004, Dr. Payne discharged Plaintiff from physical therapy noting, "I do not believe any additional physical therapy is going to be beneficial at this point" and "some of her pain complaints are related to psychological causes stemming from her injury." (R. 273.) He concluded that the limited range of shoulder motion recorded during Plaintiff's December 28, 2003 functional capacity evaluation resulted in a total upper extremity impairment of 7% for purposes of workers' compensation (R. 269.) Dr. Payne's advice was that Plaintiff "move on" and "resume a more normal lifestyle." (R. 270, 273.) Dr. Payne reviewed Plaintiff's functional capacity evaluation and found it reasonable to place a permanent restriction on Plaintiff's ability to lift more than twenty pounds and against prolonged use of her right arm overhead. (R. 270.) Accordingly, Dr. Payne found that Plaintiff had reached maximum medical improvement from her right upper extremity injury and recommended no further treatment. Id.

After more than a year absence, on May 16, 2005, Plaintiff returned to Dr. Payne complaining of continued shoulder pain and claiming to be unable to perform light duty work due to "the emotional side of her symptoms." (R. 268.) Dr. Payne noted that Plaintiff's orthopedic problem had not changed as she continued to exhibit diffuse tenderness arising from the

myofascial portion of the shoulder rather than the shoulder joint itself. Id. Dr. Payne reiterated that his recommendation for work had not changed and that a light duty work capacity was appropriate for Plaintiff. Id.

On May 26, 2005, Elizabeth Williams, Ed. S., assessed Plaintiff's level of functioning as poor and wrote: "Client now married to a pastor but still is disabled by PTSD. Gets startled easily, unable to leave house except for brief periods. Shops as little as possible and only in daylight. States she can't concentrate and finds reading difficult. Frequently has nightmares which wake her husband because she is yelling out loud." (R. 210-11.) In June 2005, Plaintiff's GAF was assessed at 70.[3] (R. 207.) She was diagnosed with PTSD, depression and panic disorder with agoraphobia. Id. To treat these symptoms, Plaintiff agreed to take prescription medication which she reported was effective and caused no adverse effects. (R. 204-07.) At her final appointment with Hampton Mental Health Associates on October 26, 2005, Plaintiff reported that although she was having trouble with her shoulder, she had "been doing good," no nightmares, and she wanted to "move forward." (R. 204.)

Plaintiff returned to Dr. Payne five months later on October 25, 2005, complaining of shoulder pain. (R. 267.) On examination, Dr. Payne noted some spasm, but Plaintiff had a full range of motion with no tenderness and full strength. Id. Dr. Payne prescribed medication and a course of physical therapy to Plaintiff. Id. At a follow-up appointment, Dr. Payne noted that Plaintiff's complaints were "psychosomatic" and suggested chronic pain management or counseling. (R. 260.)

---

[3] A GAF in the 61 to 70 range, is indicative of some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) at 6.

On February 21, 2006, Plaintiff received a complete mental assessment from Mona L. Tiernan, Psy.D, the Director of Neuropsychology and Behavioral Medicine at Riverside Rehabilitation Institute. (R. 228-34.) Plaintiff related the circumstances of her injury and subsequent treatment. (R. 228-30.) She disclosed that her daily activities included completing some household tasks such as going grocery shopping, taking out the trash, washing dishes, doing laundry, and cooking. (R. 231.) She also reported enjoying going to church and out to dinner. Id. On examination, Dr. Tiernan noted that Plaintiff appeared motivated but suspicious and relayed the details of the robbery and assault with a flat affect and anxious mood. Id. Her report noted Plaintiff "continues to experience pain on a daily basis as the result of the injury to her shoulder" and recorded the assessment results of the Minnesota Multiphasic Personality Inventory 2 ("MMPI-2") and the Structured Inventory of Malingered Symptomatology ("SIMS").

In the MMPI-2, Plaintiff was found to be elevated on six clinical scales. Dr. Tiernan wrote: "Individuals with profiles similar to this are believed to have significant psychological disturbance. Individuals with this profile may also be viewed as overly paranoid. In addition, they may appear gullible, while at the same time being angry and suspicious that others are taking advantage of them." (R. 232.) The MMPI-2 also indicated confusion, exaggerated symptom checking, or consistently misrecording her responses on the answer sheet. (R. 231.) The result of Plaintiff' SIMS indicated that her symptoms were consistent with those described by others who have a genuine disorder. (R. 232.)

Dr. Tiernan diagnosed PTSD, chronic, and estimated Plaintiff's global assessment of functioning (GAF) at 60. (R. 233.) Dr. Tiernan opined that Plaintiff could return to work at a job that does not involve customer service, initially on a part-time basis, slowly increasing to full-time.

(R. 234.)

On March 21, 2006, Plaintiff returned to Dr. Payne with new complaints: a persistent bruise on her shoulder and numbness and tingling in her right arm. (R. 258.)   On examination, Dr. Payne found no evidence of a bruise or any other abnormalities except mild diffuse tenderness through Plaintiff's shoulder. Id.   Dr. Payne referred Plaintiff to Wayne H. McAllister, IV, M.D., of Hampton Roads Neurosurgical and Spine Specialists, who ordered an EMG of the right upper extremity. (R. 254-55.)   Following a review of the results of MRI and EMG testing, Dr. McAllister determined the tests revealed carpal tunnel syndrome but no cervical radiculopathy. (R. 253- 55, 256, 332-34.)   Because Dr. Payne did not find any evidence of carpal tunnel syndrome during his physical examination, he did not recommend carpal tunnel release surgery. (R. 256.)

Dr. Payne referred Plaintiff to Paul E. Savas, M.D., for another opinion. (R. 247-48, 256.) Dr. Savas examined Plaintiff and reviewed her cervical MRI report but not the actual MRI films. (R. 247-48.)   Dr. Savas diagnosed cervical radiculopathy, spondylosis, concomitant suggestion of carpal tunnel syndrome, and concomitant shoulder dysfunction and pain. (R. 248.)   He recommended that Plaintiff return to Dr. Payne for further treatment of her shoulder. Id.

On February 6, 2007, Plaintiff returned to Dr. Payne who noted tenderness to palpation and spasms across Plaintiff's scapula, mild tenderness into her neck, a full range of motion without pain, and normal strength in her arm. (R. 246.)   Another course of physical therapy and medication were prescribed, but Dr. Payne noted that Plaintiff's symptoms were too diffuse to perform an injection. Id.   Dr. Payne stated that he did not have anything additional to offer Plaintiff and recommended chronic pain management. Id.

When Plaintiff returned to Dr. Payne on March 20, 2007, she reported improvement

following physical therapy and requested authorization for a trip to the emergency room for "pain" following her last appointment. (R. 236, 381-85.) Dr. Payne stated that Plaintiff's symptoms were consistent with a regional pain syndrome or fibromyalgia, and he refused to authorize her trip to the emergency room noting that "she was not in that severe of pain, nor did she call our office with pain complaints." (R. 236.)

At her final appointment with Dr. Payne in May 2007, Plaintiff indicated that her workers' compensation carrier had denied his referral to pain management because fibromyalgia was unrelated to Plaintiff's work-related trauma. (R. 235.) Dr. Payne clarified that Plaintiff's condition was really a "chronic pain syndrome" related to her injury that should be covered by workers' compensation. Id. He further stated he had nothing additional to offer her, and felt pain management would be the best approach to help her with her discomfort. Id.

On July 24, 2007, Plaintiff visited Mark A. Ross, M.D., on a referral from Dr. Payne, for ongoing pain management. (R. 555-59.) Dr. Ross examined Plaintiff and noted she made no effort to exaggerate her symptoms and gave a full effort at all times. (R. 557.) Dr. Ross opined that Plaintiff had a good physical recovery from her injury but that learned behaviors and psychological issues were interfering with her outcome. (R. 558.) Dr. Ross recommended use of a TENS unit, a prescription for Lidoderm patches, and continued treatment with Dr. Tiernan, Plaintiff's psychologist, to help transition Plaintiff back to work. Id.

Plaintiff returned to Dr. Tiernan for a second evaluation on August 13, 2007. (R. 413-16.) Although Plaintiff continued to have difficulty with adjustment, she acknowledged improvement in her level of anxiety. (R. 413.) Plaintiff reported leaving her home more frequently but continuing to experience high anxiety while doing so. (R. 414.) Dr. Tiernan again diagnosed

PTSD, chronic, and estimated Plaintiff's global assessment of functioning (GAF) at 60. (R. 416.) Dr. Tiernan maintained her opinion that Plaintiff could return to work at a job not involving customer service, initially on a part-time basis, slowly increasing to full-time. (R. 415.) Plaintiff attended four individual psychotherapy sessions with Dr. Teirnan focused on Plaintiff's efforts at returning to work. (R. 411-12.)

Plaintiff returned to Wayne MacMasters, M.S., P.T., for a second functional capacity evaluation on September 14, 2007. (R. 418-20.) Mr. MacMasters opined that Plaintiff's pain was out of proportion to her impairment and found that she could perform light physical demand work with occasional lifting to twenty-five pounds, and frequent lifting to fifteen pounds. (R. 419-20.)

On November 20, 2007, Carolina Longa, M.D., a Disability Determination Service's (DDS) physician, reviewed the evidence of record and completed a physical residual functional capacity assessment form. (R. 510-16.) Dr. Longa found that Plaintiff's physical impairments would not prevent her from occasionally lifting up to twenty pounds, frequently lifting up to ten pounds, standing and/or walking about six hours during an eight-hour workday, and sitting about six hours during an eight-hour workday. (R. 511.) She also found that Plaintiff could never climb ladders, ropes, or scaffolds; could occasionally use ramps and stairs; and could frequently balance, stoop, kneel, crouch, and crawl. (R. 512.) Finally, Dr. Longa found that Plaintiff had a limited ability to reach and perform fine finger manipulations. Id. Patricia Staehr, M.D., a second DDS physician, affirmed Dr. Longa's opinion on March 21, 2008. (R. 537.)

Hillary Lake, M.D., a DDS physician, reviewed the evidence of record on November 26, 2007, and completed a psychiatric review technique form regarding whether Plaintiff's mental impairments satisfied the requirements of any of the Commissioner's listed impairments. (R.

517-31.)  Dr. Lake determined that Plaintiff's had PTSD, but that the limitations from this condition did not satisfy the requirements of any of the Commissioner's listed mental impairments. (R. 522.)  Dr. Lake opined that Plaintiff's PTSD resulted in a "mild" restriction of activities of daily living, "moderate" difficulties maintaining social functioning, "moderate" difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 528.)

Dr. Lake also completed a mental residual functional capacity assessment form and concluded that Plaintiff's mental impairment resulted in no more than moderate limitations of her ability to work and that she is "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (R. 532-35.)  David Deaver, Ph.D., a second DDS physician, affirmed Dr. Lake's opinion on March 19, 2008. (R. 536.)

Beginning in April 2008, after her insured status expired, Plaintiff began counseling with Rev. James E. Price, Jr., M.Div., Ed.S., Licensed Professional Counselor and Licensed Marriage and Family Therapist, on a referral from her attorney. (R. 539-48.)  On June 27, 2008, Rev. Price completed a "Mental Residual Functional Capacity Questionnaire" which indicated Plaintiff had PTSD, chronic pain in her shoulder and arm, and a GAF of 50. (R. 540.)  Rev. Price further indicated that Plaintiff's impairments resulted in primarily either an inability to meet the competitive standards of work or a "seriously limited but not precluded" ability to do work-related activities on a day-to- day basis in a regular work setting. (R. 541.)  Specifically, he found that she had high levels of anxiety and was unable to meet competitive standards in the areas of maintaining regular attendance at work, completing a normal work day without interruptions from physical symptoms, performing at a consistent pace without an unreasonable number and length of

rest periods with normal work stress, being aware of normal hazards, and dealing with the stress of skilled and unskilled work activities. Id. He found Plaintiff to be seriously limited in the ability to maintain attention for two-hour segments, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or in proximity to others without being distracted, the ability to accept instruction and criticism from supervisors, the ability to get along with co-workers and peers, and the ability to respond appropriately in a routine work setting. Id.

**B. Hearing Testimony**

Plaintiff testified at her administrative hearing held June 4, 2009 that she drives "a couple times a week," though it hurts to turn to the right to see if anyone is passing. (R. 44.) She described her work history: four years as a cosmetic manager at Hecht's scheduling, putting stock away, attending meetings and cosmetic schools (R. 45); preceded by eight to ten years as a banquet manager, hostess, and waitress at the Lynnhaven Fish House (R. 45-46); preceded by approximately eleven months as a front-end manager at the restaurant Bella Monte (R. 46).

Plaintiff stated stress was the biggest reason she was unable to work. (R. 47.) She described an inability to focus for a long period of time, not trusting people, not feeling safe, and not going into a building unless she is with someone. Id. She explained that she has periods when she "just explode[s] about things" because she is scared, upset or nervous. Id. She related she had panic attacks a couple of times a week for several minutes where she got really nervous and shaky, and felt like she could not breathe. (R. 48.) Plaintiff and her husband testified that she has nightmares, and wakes up screaming. (R. 54, 60.) Her husband testified that she was very paranoid after the attack, and not good with going into public places. (R. 56.)

In addition to stress, Plaintiff testified pain in her right shoulder affected her ability to

work. (R. 48-49.) She could not lift anything over her head or lift more than twenty pounds. (R. 49.) She stated the pain migrates down to her hand making it difficult to hold a phone for very long or work on a computer. (R. 49, 53-54.) Plaintiff and her husband testified she took medication for the pain every night which made her groggy and tired the next day, and not really coherent. (R. 49-50, 59.) Plaintiff's husband testified that she washed clothes, but he took care of the other household chores due to her shoulder pain and lack of strength in her right hand. (R. 59.) Further, Plaintiff testified that since January 2008, she has been treated for dry eyes, a symptom of her stress. (R.50, 54.)

A vocational expert, Linda F. Augins was called to testify, and the ALJ asked her two hypothetical questions:

> Q    "… I want you to assume you're dealing with an individual who is 52 years of age, has a high school education, and past work experience as described in the record. For the first hypothetical I want you to assume that this individual is capable of light exertion as defined by Social Security regulations with additional limitations that the individual should, should not do any overhead work, could only occasionally push or pull, would be limited to performing simple, repetitive tasks and would need to work in an environment that did not involve close interaction with the general public. Would there be any jobs such an individual could perform?

> A    Yes, Your Honor. The following jobs are unskilled, light. The position of Garment Folder. In the national economy there are 460,000 jobs and 2,100 jobs in Hampton Roads. And that of a Mail Sorter. In the national economy there are 170,000 jobs, 600 jobs in Hampton Roads.

> Q    If the individual has limitations and abilities as described here in the testimony today would there be any jobs such an individual could perform?

> A    No, sir.

(R. 61-62.)

## C. The ALJ's Decision

As a preliminary matter, ALJ Dodson found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2007. (R. 12.) ALJ Dodson then made the following findings under the five-part test for disability: (1) Plaintiff has not engaged in substantial gainful activity from September 1, 2002 (the alleged onset date of disability) through December 31, 2007; (2) Plaintiff has the following severe impairments: post traumatic stress disorder, depression, cervical degenerative disc disease, and chronic myofascial pain of the neck and back; (3) Plaintiff's combination of impairments did not meet or equal one of the official impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526); (4) Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) through the date last insured, except that she cannot perform overhead work or tasks requiring more than occasional pushing or pulling; (5) Plaintiff was unable to perform past relevant work prior to expiration of her insured status; and (6) "there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed" through the date last insured. (R. 14-22.) Thus, the ALJ concluded that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from September 1, 2002, the alleged onset date, through December 30, 2007, the date last insured. (R. 22.)

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. §

405(g) (2008); <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. of N. Y. v. NLRB</u>, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." <u>Craig</u>, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. <u>Perales</u>, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. <u>ANALYSIS</u>

To qualify for a period of disability and DIB under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, and be under a "disability" as defined in the Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the:

inability to do any substantial gainful activity[4] by reason of any medically determinable physical or mental impairment[5] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a) (2010); <u>see</u> <u>also</u> 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2008). To meet this definition, the claimant must have a "severe impairment"[6] which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[7] 20 C.F.R. § 404.1505(a) (2010); <u>see</u> <u>also</u> 42 U.S.C. § 423(d)(2)(A) (2008).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The

---

[4] "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties; and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; § 416.910 (2010). Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572 (2010).

[5] "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[6] The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c), 416.920(c) (2010).

[7] The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2 (2010). However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy. 20 C.F.R. § 416.920(f) (2010); § 404.1520(f) (2010); <u>Heckler v. Campbell</u>, 461 U.S. 458, 466 (1983); SSR 83-10.

Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.

Plaintiff argues to this Court that ALJ Dodson erred in each of the following ways: (1) "in failing to sustain his burden to establish that there is other work in the national economy that Plaintiff can perform;" (2) "in rejecting the opinion of Plaintiff's Licensed Professional Counselor Rev. James E. Price, Jr., M.Div., Ed.S.;" (3) "in failing to accord adequate weight to the opinion of Clinical Psychologist Mona Tiernan, Psy.D., as to part-time work;" (4) "in asking the Vocational Expert a deficient hypothetical question;" (5) "in that he incorrectly required that the medical evidence support the degree of pain and anxiety alleged;" and, (6) in "finding that there was no evidence of cervical radiculopathy," as this was not based on substantial evidence as required by 42 U.S.C. § 405(g). (Pl.'s Mem. at 2, 12-26, ECF No. 11.)

## A.   ALJ Correctly Relied Upon Vocational Expert Testimony

At the fifth prong of the five-part test for disability, "the burden shifts to the Secretary to prove that the claimant retains sufficient residual function capacity ["RFC"] to perform work available in the national economy." Harper v. Sec'y of Health and Human Servs., 1987 WL 41844, at *1 (E.D. Va. 1987) (citing Hall v. Harris, 658 F.2d 260 (4th Cir. 1981)). Plaintiff argues

17

the ALJ failed to discharge this burden, because the ALJ ignored the vocational expert's testimony that if Plaintiff had the "limitations and abilities as described" in the hearing testimony, she would not be able to perform any job. (Pl's. Mem. at 12-15.)

During Plaintiff's hearing, the ALJ called a vocational expert, Linda F. Augins, to testify, and the following exchange occurred:

> Q    "... I want you to assume you're dealing with an individual who is 52 years of age, has a high school education, and past work experience as described in the record.  For the first hypothetical I want you to assume that this individual is capable of light exertion as defined by Social Security regulations with additional limitations that the individual should, should not do any overhead work, could only occasionally push or pull, would be limited to performing simple, repetitive tasks and would need to work in an environment that did not involve close interaction with the general public.  Would there be any jobs such an individual could perform?
>
> A    Yes, Your Honor.  The following jobs are unskilled, light.  The position of Garment Folder.  In the national economy there are 460,000 jobs and 2,100 jobs in Hampton Roads.   And that of a Mail Sorter.   In the national economy there are 170,000 jobs, 600 jobs in Hampton Roads.
>
> Q    If the individual has limitations and abilities as described here in the testimony today would there be any jobs such an individual could perform?
>
> A    No, sir.

(R. 61-62.)  In his opinion, the ALJ relied upon Ms. Augins's answer to the first hypothetical question to conclude, "through the date last insured, considering [Plaintiff]'s age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (R. 22.)

The ALJ did not have to accept all testimony given during the hearing as true.   Instead, the

ALJ was required to make an independent determination as to the witness's credibility with regards to Plaintiff's pain and other symptoms. <u>See</u> 20 C.F.R. § 404.1529(a) (2010). The ALJ found Plaintiff's testimony at the hearing to be only partially credible. (R. 19.) Consequently, the ALJ did not rely upon the second hypothetical to the vocational expert, rather the ALJ correctly relied upon the vocational expert's testimony that were an individual to have the limitations the ALJ found support for in the record, the individual would be able to perform two jobs in the national economy. (R. 62.)

**B.**   **ALJ Correctly Assigned Rev. James E. Price, Jr.'s Opinion "No Significant Weight"**

Next, Plaintiff asserts the ALJ erred in assigning Rev. Price's opinion "no significant weight." (Pl. Mem. at 15.) On a referral from her attorney, Plaintiff began treating with Rev. Price in April 2008, several months after her date last insured. (R. 540, 543.) In June 2008, Rev. Price filled out a Mental Residual Functional Capacity Questionnaire opining that Plaintiff had significant functional limitations of her ability to work. (R. 540-42.) The ALJ noted that Rev. Price did not start seeing Plaintiff until after the date she was last insured, and the record does not indicate he is a practicing psychologist or psychiatrist. (R. 20.) Therefore, the ALJ assigned the opinion "no significant weight." <u>Id.</u>

Plaintiff argues this was error on the part of ALJ Dodson, because (1) that Rev. Price did not start seeing Plaintiff until after the date she was last insured was insufficient reason to discredit his evidence; (2) the ALJ had a duty to "recontact" Rev. Price to get his credentials; (3) Rev. Price's records and opinion would have helped the ALJ correctly assess Plaintiff's mental impairments; (4) the ALJ erred in not treating Rev. Price's opinion as the opinion of a "treating physician;" and, (5) the ALJ's decision to reject Rev. Price's opinion resulted in a decision that

was not based on substantial evidence of record.

First, Rev. Price's treatments notes and questionnaire evaluating Plaintiff's mental impairments are dated after Plaintiff's last date insured, and do not relate back in any way to the relevant period, prior to December 2007. Plaintiff argues Rev. Price's evidence and opinion should be given at least as much weight as non-examining physicians, because the records do not "conflict with or contradict prior medical evidence in the record," and "there is no evidence to indicate that Plaintiff's condition was any different or any better prior to December 31, 2007." (Pl's. Mem. at 15-16.) In fact, Rev. Price's opinion is contradicted by Dr. Tiernan, Plaintiff's treating psychologist, who treated Plaintiff during the relevant time period prior to December 2007. Dr. Tiernan opined in 2006 and 2007 that Plaintiff could return to work at a job not involving customer service, initially on a part-time basis, slowly increasing to full-time. (R. 234, 415.) This certainly contradicts Rev. Price's opinion that Plaintiff's impairments resulted in either an inability to meet the competitive standards of work or a "seriously limited but not precluded" ability to do work-related activities on a day-to-day basis in a regular work setting. (R. 541.) Rev. Price's opinion is also contradicted by the opinions of Dr. Lake and Dr. Deaver, the DDS physicians' who reviewed Plaintiff's medical records from the relevant period prior to her date last insured. Dr. Lake and Dr. Deaver found Plaintiff's mental impairment resulted in no more than moderate limitations of her ability to work. (R. 532-36.) These state agency physicians are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(i) (2010). Rev. Price's opinion is contradicted by the opinions of Dr. Tiernan, Dr. Lake and Dr. Deaver, all doctors relying on medical evidence during the relevant period. Therefore, the ALJ did not err in assigning Rev. Price's opinion less weight

than that given to these doctors.

Plaintiff argues the ALJ erred in commenting that Rev. Price was not a practicing psychologist or psychiatrist, and the ALJ should have recontacted Rev. Price to get his credentials. (Pl. Mem. at 16.) Further, Plaintiff asserts the ALJ erred in not evaluating Rev. Price's evidence as that of a treating physician. Id. at 19. The record reflects that Rev. Price is a Licensed Professional Counselor and a Licensed Marriage and Family Therapist. (R. 539.) No "recontact" was necessary to establish this. However, Rev. Price is not a licensed psychologist or psychiatrist, and his opinion is not entitled to the evaluation of a treating physician's opinion. A counselor or therapist is not an "acceptable medical source" whose opinion may be entitled to controlling weight under the regulations. 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2) (2010).

Lastly, substantial evidence supports ALJ Dodson's opinion, including: Dr. Payne's opinion that Plaintiff could perform light duty work with restrictions against overhead work and heavy lifting (R. 273); physical therapist Wayne Mac Masters's opinion that Plaintiff could work at the sedentary and light physical demand classification with maximum lifting of twenty pounds (R. 302-04); Dr. Su's opinion that Plaintiff could perform work at the light physical demand level (R.189); Dr. Tiernan's opinion on two occasions that Plaintiff could return to work at a job that does not involve customer service, though initially at part-time (R. 234, 415); Dr. Longa and Dr. Staehr's opinions that Plaintiff could stand or walk for six hours in an eight-hour workday and sit for six hours (R. 511, 537); and Dr. Lake and Dr. Deaver's opinions that Plaintiff's mental impairment resulted in no more than moderate limitations of her ability to work (R. 532-36). Therefore, ALJ Dodson did not err in assigning Rev. Price's opinion "no significant weight," and substantial evidence in the records supports ALJ Dodson's opinion.

**C.     ALJ Assigned Correct Weight to Dr. Mona L. Tiernan's Opinion**

Plaintiff contends the ALJ erred by assigning improper weight to the opinion of Mona L. Tiernan, Psy.D., that Plaintiff could work only part time. (Pl. Mem. at 20.)   Plaintiff asserts this finding by Dr. Tiernan was supported by the Disability Determination Service's physicians' report finding Plaintiff could stand or walk or sit for only six hours of an eight-hour day. (Pl. Mem. at 21.)

In February 2006 and August 2007, Dr. Tiernan opined that Plaintiff could return to work at a job that does not involve customer service, initially on a part-time basis, slowly increasing to full-time. (R. 234.)   Under the federal regulations and case law, a treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."   20 C.F.R. §416.927(d)(2) (2010); see also Craig, 76 F.3d at 590.   The ALJ found the record supported Dr. Tiernan's opinion that Plaintiff should not work with the public. (R. 20.)   However, the ALJ found the record did not support Dr. Tiernan's opinion that Plaintiff should begin working on a part-time basis, and the ALJ gave this portion of Dr. Tiernan's opinion minimal weight. Id.

The DDS physician, Dr. Longa found that Plaintiff's physical impairments would not prevent her from standing and/or walking about 6 hours during an 8-hour workday, and sitting about 6 hours during an 8-hour workday. (R. 511.)   Patricia Staehr, M.D., a second state agency physician, affirmed Dr. Longa's opinion. (R. 537.)   Plaintiff incorrectly interprets these findings as limiting her to a 6-hour workday. (Pl. Mem. at 21.)   To the contrary, the DDS physicians found Plaintiff able to work an 8-hour day by standing or walking up to six hours and sitting up to six hours. Moreover, Dr. Lake and Dr. Deaver found Plaintiff's mental impairment resulted in no

more than moderate limitations of her ability to work. (R. 532-36.)   In addition, several treating doctors and therapists found Plaintiff could return to full-time work with light duty restrictions, including Dr. Payne (R. 317), Mr. MacMasters, P.T. (R. 302-04), and Dr. Su (R. 189). Accordingly, there is substantial evidence in the record to support the ALJ's decision to accord Dr. Tiernan's finding that Plaintiff begin working on a part-time basis minimal weight.

**D.      Hypothetical Posed to Vocational Expert Was Not Deficient**

Plaintiff asserts the ALJ erred in asking the vocational expert a deficient hypothetical question, which did not fairly set out all of Plaintiff's impairments. (Pl's. Mem. at 21-23.) Plaintiff again makes the argument that only the second hypothetical to the vocational expert, which asked the vocational expert to consider the limitations and abilities described during the hearing testimony, was complete. (Pl. Mem. at 22.)   As stated in Part IV. A., <u>supra</u>, the ALJ is not required to accept the hearing testimony as true, rather the ALJ must make an independent determination of the witnesses' credibility.   The ALJ found Plaintiff's testimony to be partially credible, and did not rely upon the second hypothetical, which was based on the assumption that all the hearing testimony was credible.

Next, Plaintiff asserts the ALJ's first question to the vocational expert was deficient, because it did not include all of Plaintiff's impairments, specifically, (1) her inability to work full time, (2) the effect of pain, and (3) her carpal tunnel syndrome. (Pl. Mem. at 22-23.)   The ALJ assigned only minimal weight to Dr. Tiernan's opinion that Plaintiff should begin working part-time, gradually increasing to full-time. <u>See</u> <u>supra</u>, Part IV. C.   Secondly, the ALJ found Plaintiff's testimony regarding the effect of pain to be only partially credible. This determination will be discussed in Part IV. E., <u>infra</u>.   Finally, as will be discussed in more detail in Part IV. F.,

infra, the ALJ found Plaintiff had no significant limitations due to carpal tunnel syndrome. The ALJ's findings with respect to full-time work, Plaintiff's testimony regarding pain, and carpal tunnel syndrome are all supported by substantial evidence in the record. Consequently, the ALJ's hypothetical to the vocational expert was not deficient for failing to include these limitations.

**E.    ALJ Properly Evaluated Plaintiff's Credibility Regarding Pain and Anxiety**

Plaintiff argues that the ALJ erred by finding Plaintiff only partially credible with respect to her statement of symptoms. Once the claimant establishes a medically determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ must then evaluate the intensity of these symptoms and determine what limitations they impose on a claimant's ability to work. 20 C.F.R. § 404.1529(c)(1) (2010); Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006); Craig, 76 F.3d at 595. ALJ Dodson stated that the "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are only partially credible." (R. 19.) In making credibility determinations, the ALJ must consider the entire record and provide specific reasons for the finding on credibility, supported by evidence in the record. Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985); S.S.R. 96-7p, 1996 WL 374186, at *4.

ALJ Dodson discussed Plaintiff's testimony, and his reasons for finding her testimony only partially credible. (R. 17-20.) He stated, "Ms. Linkous reports chronic right shoulder pain [], depression, flashbacks of post trauma, nightmares and feelings of panic and fear when she has to go places by herself or when she is around the public." (R. 18.) In finding "[t]he objective findings on examinations and test results do not support the degree of limitation the claimant

24

reports in the use of her upper extremities as of the date she was last insured for disability benefits," the ALJ relied upon the following evidence in the record: (1) Dr. Payne's 2003 assessment that Plaintiff could perform light duty work with restrictions against overhead work and heavy lifting (R. 18, 273); (2) treatment notes from five visits to Dr. Payne dated July 2003 through June 2006 showing full or "very good" range of motion, and no decrease in muscle strength with the exception of the June 2006 assessment revealing "slightly reduced grip strength" (R. 18), and (3) the residual functional capacity evaluation completed by physical therapist Wayne MacMasters in September 2007 indicating Plaintiff could perform work activities in the light exertional range, and concluding Plaintiff's reported level of pain was out of proportion to her impairment (R. 18, 419-20).

Next, the ALJ found "[t]he medical evidence related to the claimant's mental impairments shows that she has residual anxiety and depression related to the assault that has not completely resolved with treatment but treatment records do not support the degree of limitation alleged." (R. 19.) The ALJ summarized Plaintiff's treatment notes from June 2005 through September 2007, including her treating psychiatrist's, Dr. Tiernan's, assessment that Plaintiff was capable of work as long as she did not have to interact directly with the public, and reports of symptom improvement with treatment and use of medications. (R. 19, 234, 415.) Lastly, the ALJ considered Plaintiff's report to Dr. Tiernan in August 2007 of her daily activities and social functioning, including attending church and going out to dinner with her husband, and found the activities were not consistent with disabling pain and mental limitations. (R. 19.)

The ALJ concluded Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were only partially credible. (R. 19.) "Because he had the

opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). The ALJ's determination that Plaintiff's testimony was partially credible is supported by substantial evidence.

**F.** **Substantial Evidence Supports the ALJ's Findings with regards to Cervical Radiculopathy and Carpal Tunnel Syndrome**

Lastly, Plaintiff asserts the ALJ erred when relying on an EMG from July 2006 to find no evidence of cervical radiculopathy (R. 15), due to the fact that the November 27, 2006 report of Mid Atlantic Spine Specialists showed cervical radiculopathy. (Pl's. Mem. at 25.) On July 12, 2006, following a review of Plaintiff's MRI scans and EMG testing, Dr. McAllister concluded Plaintiff had degenerative disc disease, a disc herniation, and moderately severe carpal tunnel syndrome, but "no evidence of cervical radiculopathy." (R. 253.) Dr. Payne, Plaintiff's treating physician, performed a physical examination on October 31, 2006, and reported all negative findings. (R. 256.) On November 27, 2006, Dr. Savas reviewed a cervical MRI report because the "actual images [were] not available for review," and noted "IMPRESSION: Cervical radiculopathy and spondylosis with concomitant suggestion of carpal tunnel syndrome and concomitant shoulder dysfunction and pain" (R. 248). This is the report on which Plaintiff relies for her argument. However, the doctor who had EMG test results and MRI images, not solely the MRI report, found no cervical radiculopathy, and physical testing resulted in all negative findings. Moreover, no doctor assessed any functional limitation resulting from cervical radiculopathy. As a result, there is substantial evidence in the record to support ALJ Dodson's finding of no cervical radiculopathy.

Plaintiff asserts the finding by the ALJ of no cervical radiculopathy was the basis for

failing to consider the cumulative effect of carpal tunnel syndrome with PTSD, depression, cervical degenerative disc disease, and chronic myofascial pain of the neck and back. (Pl. Mem. at 25.) Plaintiff relied on a notation from Pinnacle Hand Therapy that, "the effect of this condition on lifestyle is rated 10 of 10 (0 no effect, 10 profound effect)." (R. 551.) Id. This notation was made in the "subjective" section of the therapy report, along with Plaintiff's statements about daily activities, and appears to be Plaintiff's rating of her right shoulder impairment. (R. 551.) Further, the therapy report is dated June 19, 2008, several months after Plaintiff's date last insured. Id.

Consequently, there was substantial evidence in the record to support the ALJ's finding of no cervical radiculopathy and no significant limitations due to carpal tunnel syndrome. (R. 15.)

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be AFFIRMED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this Report or

specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984), cert. denied, 474 U.S. 1019 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).


_____/s/_____
Tommy E. Miller
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 19, 2011

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Laura M. Thornberry, Esq.
352 McLaws Circle
Williamsburg, VA   23185

Walter Neal Thorp, Esq.
Law Offices of Walter N. Thorp
610 Thimble Shoals
Suite 102
Newport News, VA   23606

Virginia L. Van Valkenburg, Esq.
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, Virginia   23510

Fernando Galindo, Clerk

By _____

Deputy Clerk

January          , 2011